IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES V. EMORY,

        Plaintiff,

  v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

CIVIL ACTION FILE

 NO. 1:11-CV-2908-TWT-JFK

## FINAL REPORT AND RECOMMENDATION

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision

of the Commissioner of the Social Security Administration which denied his disability

applications. For the reasons set forth below, the court **RECOMMENDS** that the

Commissioner's decision be **AFFIRMED**.

## I.    Procedural History

Plaintiff James V. Emory filed applications for a period of disability, disability

insurance benefits, and supplemental security income on January 16, 2009, alleging

that he became disabled on January 13, 2008. [Record ("R.") at 10, 125-34]. At the

administrative hearing, Plaintiff's representative amended his alleged onset date to

November 17, 2008. [R. at 10, 31]. After Plaintiff's applications were denied initially and on reconsideration, a hearing was held on February 3, 2011. [R. at 28-67, 72-86]. Administrative Law Judge ("ALJ") Karen Cornick issued a decision on February 10, 2011, denying Plaintiff's claims. [R. at 10-23]. Plaintiff requested review of the ALJ's decision, but the Appeals Council denied his request on June 30, 2011, making the hearing decision the final decision of the Commissioner. [R. at 1-6]. On September 6, 2011, Plaintiff filed the above-styled action in this court seeking review of the final decision. [Doc. 4].

## II.    Facts

Plaintiff James V. Emory was born on September 9, 1972, making him 36 years old on his alleged onset date of November 17, 2008. [R. at 10, 21, 31]. Plaintiff has a ninth grade education and past relevant work as a glass cutter, crane operator, door and window builder, assistant manager of a restaurant, kitchen manager, truck driver, and carpenter. [R. at 15, 21, 54-55]. The ALJ found that Plaintiff has depression, anxiety, status post pericarditis, status post remote motor vehicle accident with multiple trauma, arthritis, degenerative joint disease, and spondylosis. [R. at 12]. Although these impairments are "severe" within the meaning of the Social Security regulations, the ALJ concluded that Plaintiff did not have an impairment or

2

combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. at 12-14]. The ALJ found that although Plaintiff was unable to perform any of his past relevant work, there are a significant number of jobs in the national economy that he can perform. [R. at 22]. As a result, the ALJ concluded that Plaintiff has not been under a disability from November 17, 2008, the alleged onset date, through February 10, 2011, the date of the ALJ's decision. [R. at 23].

The decision of the ALJ [R. at 10-23] states the relevant facts of this case as modified herein as follows:

The claimant's allegations as presented in his testimony are that he is 38 years old and completed the ninth grade. He last worked in May 2008. The claimant found his pain unbearable, despite using over-the-counter medications. He took himself off prescription pain medication to prevent becoming dependent because he was using more medication than prescribed. He had been taking prescription pain medication when he was working and testified that it helped him perform his job. The claimant's pain began at age thirteen when he had a motorcycle accident, injuring his left arm that required multiple surgeries. On November 17, 2008, the claimant fell 25 to 30 feet out

of a tree he was attempting to cut down. Since that time, his knee swells and his right leg is numb every morning, and he experiences pain in his right hip.

The claimant testified that he can sit for fifteen to twenty minutes at a time. Using a cane, he can stand for ten to fifteen minutes at one time. After sitting for ten to fifteen minutes, he needs to stand up to relieve the feeling of pins, needles, and burning. Without his walker, he can stand for six minutes. He performs no household chores, and he cannot drive due to his delayed reaction time. The claimant is unable to fully extend the fingers of his left hand due to injuring his wrist when he was thirteen. He spends most of his time in bed. He sits to shave and shower. If he alternated sitting and standing, he could proceed for three hours, but he would then need to lie down to relieve his back pain. He cannot bend, and he uses a cane for walking as well as a walker for longer distances.

The earliest medical evidence of record is a treatment note from Dr. John Sprato in December 2006 when the claimant complained of right leg and left arm pain. Dr. Sprato diagnosed the claimant with degenerative osteoarthritis of the left elbow. The claimant complained of the same pain in January 2007 as it worsened with the cold weather. In April 2007, the claimant added low back pain to his complaints. He was noted to be taking no medications other than Tylenol. (Exhibit 1F). On November 7,

2007, the claimant presented to the Tanner Medical Center emergency department complaining of chest pain and shortness of breath. Telemetry, laboratory studies of cardiac enzyme levels, and a stress test were all unremarkable. The claimant's chest pain improved, and he was discharged. (Exhibit 2F).

On November 17, 2008, the claimant was trimming a tree at his mother-in-law's home when he fell from the top of a ladder. He presented to Tanner Medical Center emergency department. The claimant primarily complained of pain in his right wrist and, to a lesser extent, in the right foot. He denied any neck or back pain and no acute weakness, numbness, or tingling, although he had chronic numbness and tingling in his right leg due to the old motorcycle accident. Upon physical examination, his neck was not tender and it had a full range of motion. He did have diffuse right-sided tenderness including mild diffuse tenderness about the right heel and ankle. The serious injury was an obvious deformity, and there was distal tenderness in the right forearm and wrist. An x-ray study showed a displaced fracture of the distal radius and ulna. All other x-ray studies were negative except for a fracture of the right sixth rib. The claimant was also noted to have multiple contusions and abrasions from his fall. The forearm fracture was reduced in the emergency department under conscious sedation, and the claimant was discharged with instructions to use ice and elevate the

5

forearm with a splint. The claimant was also instructed to use pain medication every six hours. While in the emergency department, the claimant also underwent a computerized tomography scan of the cervical spine that revealed multilevel discogenic degenerative change, most severe at C4-C5 and C5-C6 characterized by disc space narrowing and marginal osteophyte formation. There was mild to moderate left C4-C5 osseous neural foraminal stenosis but no significant central canal stenosis. An x-ray study of the right foot did not show any fracture or subluxation. (Exhibit 2F).

In December 2008, the claimant followed up on his injury at Pinnacle Orthopaedics and Sports Medicine. The claimant reported that his wrist was stiff, but he otherwise had no complaints. Physical examination showed moderate tenderness over the distal radiocarpal joint with decreased range of motion and strength in the wrist. However, the claimant's coordination was intact and there were no sensory deficits. X-ray studies of the right wrist showed the fracture had healed in an acceptable position. The claimant was given a home exercise program and advised to pursue activities as tolerated. (Exhibit 3F).

In May 2009, the claimant presented to Tanner Medical Center emergency department complaining of pain in his left axilla and anterior chest wall with shortness of breath. Upon physical examination, the claimant sat upright with no distress. His

6

extremities had a full range of motion, and all systems appeared normal except for some tenderness to the left axilla. The final diagnosis was left axillary cellulitis. Five days later, the claimant returned complaining about sharp chest pain but only residual axillary tenderness was found. A chest x-ray was negative, and an electrocardiogram revealed no evidence of acute ischemia. He was given medication for pain and nausea, leading to improved condition and discharge. (Exhibit 4F). The claimant returned in June 2009 complaining of a return to shortness of breath once he tapered off a steroid and antibiotic given to him one week earlier. Laboratory studies showed normal cardiac enzyme values. He had evidence of a draining infection in the axilla. He was diagnosed with pleuritis pericarditis and a persistent staphylococcal abscess in the left axial, and he was treated with antibiotics. (Exhibit 4F).

In late May 2009, Dr. Saurabh Desai performed a physical consultative examination of the claimant. The claimant alleged pain in his left arm, right leg, and back and stiffness in his right wrist as well as numbness and tingling in both of his legs, left hand, and right thigh. He reported diagnoses of arthritis and a learning disorder. The claimant alleged that he was unable to put his arm behind him far enough to reach his buttocks. He also alleged that he could shower and put on his clothes only with his wife's assistance. Upon examination, Dr. Desai found that the

7

claimant weighed 248 pounds and was five feet ten inches tall. Sensation was intact, but he displayed reduced strength in most extremities with a reduced range of motion in his back, left arm, left hip, right hip, and bilateral knees. His gait was slow, favoring the right side and using a cane. X-ray studies of the lumbar spine demonstrated degenerative disc disease as opposed to normal variation of the L5-S1 disc space, but the study was otherwise negative. An x-ray study of the right hip revealed a femoral rod due to an old healed femur fracture. The study was otherwise negative. The x-ray study of the left forearm showed an old healed fracture of the distal humerus with a plate and fixation screws in good position. (Exhibit 13F).

Dr. Onaje Greene completed a cardiac questionnaire on June 19, 2009. Dr. Greene wrote that the claimant had chest pain with deep breaths and that his symptoms were relieved with steroids and taking short breaths. No cardiac medications were prescribed, and no cardiac condition was diagnosed. (Exhibit 5F).

In September 2009, the claimant presented to Tanner Heart and Vascular Specialists of West Georgia complaining of painful breathing for the past four days. Steroids had helped and symptoms had improved, but the symptoms then worsened. The claimant was treated for an infection. (Exhibit 10F).

AO 72A

(Rev.8/82)

In July 2009, Rebecca Blakeman, Ph.D., performed a psychological consultative examination. The claimant reported that he had a number of physical impairments that interfered with his ability to make his quota as a door and window builder at his last job. When asked about his current mood, the claimant stated that he was "not happy" and was "irritated, frustrated, and quick tempered." He was frustrated by his physical limitations and tended to be very hard on himself in relation to accepting his limitations. He tended to isolate himself and said he would isolate himself "forever, if he could." However, suicidal ideations were denied. The claimant stated that he still enjoys activities with his family but that he had a loss of appetite and had lost 16 pounds in the last month. He reportedly had difficulty sleeping at night, due largely to pain as well as difficulty breathing and chest pain when he was lying down. He also was afraid to go to sleep for fear of dying, as several family members have died in their sleep, including a brother who died at age 26. The claimant stated that he felt "tired all the time" and spent most of his time in bed, including eating most of his meals in bed. He stated that he had difficulty with concentration. He could no longer read a book because he could not remember what he had read even after a few pages.

During the examination with Dr. Blakeman, the claimant walked slowly with a limp and the assistance of a cane. The claimant endorsed feelings of hopelessness and

9

helplessness. There was a history of panic symptoms, though none recently. Hallucinations were denied as were homicidal ideations. Stream of thought was logical. Concentration during the interview appeared appropriate. Dr. Blakeman noted that the claimant was fully oriented. He recalled three out of three objects immediately and two out of three after a delay. He could recall five digits forward and three in reverse. Memory appeared intact as did judgment and insight. On the Wechsler Adult Intelligence Scale - Fourth Edition, the claimant attained a full scale IQ of 75, suggestive of intellectual functioning in the borderline to low average range. His achievement scores were 85 for Math and 89 for Word Reading which was in the low average range. Dr. Blakeman diagnosed the claimant with anxiety disorder and major depressive disorder, mild to moderate. Dr. Blakeman concluded that the claimant appeared capable of acquiring and using new information, as well as understanding and following verbal directions. Memory and concentration were expected to be adequate in the work setting. Dr. Blakeman also found that persistence may be low due to depression, which could hinder the claimant's ability to meet production norms. (Exhibit 6F).

There is no treatment or hospitalization related to mental health, not even the prescription of medication. Other than one remark that the claimant was anxious while

undergoing a medical crisis, the only notations in the record concerning mental health are that the claimant was alert and fully oriented.

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## III.    Standard of Review

An individual is considered to be disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).    The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is more than a scintilla and is

such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. at 1440. "Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving his disability. See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. At step one, the claimant must prove that he is not engaged in substantial gainful activity. See id. The claimant must establish at step two that he is suffering from a severe impairment or combination of impairments. See id. At step three, the Commissioner will determine if the claimant has shown that his impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R.

AO 72A
(Rev.8/82)

Part 404, Subpart P, Appendix 1.  See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  If the claimant is able to make this showing, he will be considered disabled without consideration of age, education, and work experience.  See id.  "If the claimant cannot prove the existence of a listed impairment, he must prove at step four that his impairment prevents him from performing his past relevant work."  Doughty, 245 F.3d at 1278.  "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides his past relevant work."  Id.  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).

## IV.    Findings of the ALJ

The ALJ made the following findings of fact:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.    The claimant has not engaged in substantial gainful activity since November 17, 2008, the alleged onset date.  (20 C.F.R. §§ 404.1571, *et seq.*, and 416.971, *et seq.*).

3.    The claimant has the following severe impairments: depression, anxiety, status post pericarditis, status post remote motor vehicle accident with multiple

trauma, arthritis, degenerative joint disease, and spondylosis. (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). The claimant can occasionally climb, kneel, balance, stoop, bend, crouch, and crawl. He must also avoid concentrated exposure to hazards and climbing ladders, ropes, and scaffolds. The claimant requires the option to sit and stand as needed. The claimant can occasionally use hand and foot controls, and he can frequently, but not repetitively, handle objects on the right and occasionally on the left. He uses an assistive device for ambulating. He can perform simple work with occasional interaction with other employees, supervisors, and the public.

6.    The claimant is unable to perform any past relevant work. (20 C.F.R. §§ 404.1565 and 416.965).

7.    The claimant was born on September 9, 1972, and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 C.F.R. §§ 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English. (20 C.F.R. §§ 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

AO 72A
(Rev.8/82)

national economy that the claimant can perform. (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 17, 2008, through the date of the ALJ's decision. (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

[R. at 10-23].

## V.    Discussion

The ALJ in the present case found at the first step of the sequential evaluation that Plaintiff James Emory had not engaged in substantial gainful activity since the alleged onset date of November 17, 2008. [R. at 12]. At the second step, the ALJ determined that Plaintiff has depression, anxiety, status post pericarditis, status post remote motor vehicle accident with multiple trauma, arthritis, degenerative joint disease, and spondylosis. [Id.]. Although these impairments are "severe," the ALJ found at the third step that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. at 12-14]. The ALJ found at the fourth and fifth steps that although Plaintiff is unable to perform any of his past relevant work, there are other jobs that exist in significant numbers in the national economy that he can perform. [R. at 21-22]. As a result, the ALJ concluded that Plaintiff has not been

15

under a disability from his alleged onset date through the date of the ALJ's decision. [R. at 23].

Plaintiff Emory argues that the ALJ's decision should be reversed. Plaintiff contends that the ALJ failed to apply the appropriate legal standards in formulating the residual functional capacity assessment and that this assessment is not supported by substantial evidence. [Doc. 13 at 11-17]. Plaintiff also contends that the ALJ did not properly evaluate credibility. [Doc. 13 at 17-18]. Plaintiff's final argument is that the vocational expert's testimony cannot provide substantial evidence for the ALJ's decision to deny benefits. [Doc. 13 at 19-20].

### A.    Residual Functional Capacity Assessment

"The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. . . . Along with his age, education and work experience, the claimant's residual functional capacity is considered in determining whether the claimant can work." Lewis, 125 F.3d at 1440 (citing 20 C.F.R. §§ 404.1520(f), 404.1545(a)). In determining the claimant's residual functional capacity ("RFC"), the ALJ is required to consider the limiting effects of all the claimant's impairments, even those that are not severe. See

16

Phillips, 357 F.3d at 1238 ("[T]he ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case."); 20 C.F.R. § 404.1545(e).

Social Security Ruling ("SSR") 96-8p provides in part, "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . . Only after that may RFC be expressed in terms of the exertional levels of work. . . ." The function-by-function assessment evaluates the claimant's "remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling." SSR 96-8p. Plaintiff argues that the ALJ did not apply the proper legal standards because she did not make a function-by-function finding of Plaintiff's work-related abilities.

The court finds that the ALJ adequately evaluated and expressed Plaintiff's functional limitations and restrictions in the decision. The ALJ found that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a)." [R. at 14]. The regulations cited by the ALJ provide in part:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves

sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a); accord SSR 83-10. "Occasionally" is defined as "occurring from very little up to one-third of the time." SSR 83-10. "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10. The court concludes that the ALJ acted in accordance with SSR 96-8p when she found that Plaintiff could perform work-related functions at the sedentary exertional level, especially given the ALJ's citations to the regulations defining this level of work. See Carson v. Comm'r of Social Security, 440 Fed. Appx. 863, 864 (11th Cir. 2011) ("While the ALJ did not specifically refer to Mr. Carson's ability to walk or stand, the ALJ did limit Mr. Carson's exertional level of work to 'light work.' 'Light work' by definition limits the amount an individual can walk or stand for approximately six hours in an eight-hour work day.").

In addition to finding that Plaintiff was limited to sedentary work, the ALJ also included a number of specific functional and postural limitations. [R. at 14]. The ALJ limited Plaintiff to occasional climbing, kneeling, balancing, stooping, bending,

crouching, and crawling. [Id.]. The ALJ also found that Plaintiff requires the option to sit and stand as needed and that he must avoid concentrated exposure to hazards and climbing ladders, ropes, and scaffolds. Plaintiff was limited to the occasional use of hand and foot controls and frequent handling of objects with the right hand and occasional handling of objects with the left hand. [R. at 14]. The ALJ also limited Plaintiff to simple work with occasional interaction with other employees, supervisors, and the public. [Id.]. The ALJ thoroughly evaluated Plaintiff's RFC and adequately expressed his functional limitations. See Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007) (holding that the ALJ complied with SSR 96-8p when he found that plaintiff could perform light exertional work).

Plaintiff next argues that the ALJ erred when she found that Plaintiff "requires the option to sit and stand as needed." [Doc. 13 at 12-14; R. at 14]. At the administrative hearing, the ALJ posed a hypothetical to the vocational expert ("VE"), Sue Turner, which included the same "option to sit or stand as needed." [R. at 55]. Social Security Ruling 96-9p provides in part, "The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." Plaintiff argues that the ALJ failed to apply the proper law because she did not incorporate in

19

the RFC the specific frequency or amount of time that Plaintiff would need to alternate sitting and standing. [Doc. 13 at 12-14]. The undersigned disagrees.

Like Plaintiff Emory in the present case, the plaintiff in <u>Lucas v. Astrue</u>, 2012 WL 6043089 (N.D. Ala. December 4, 2012), argued that "the ALJ failed to address the specific amount of time Plaintiff could sit and stand in his RFC assessment, merely stating that he could sit and stand 'as needed.'" <u>Id.</u>, at *4. The court rejected the plaintiff's argument and found that the "common-sense reading of the ALJ's RFC assessment and the hypothetical question he posed to the VE is that the ALJ contemplated a sit/stand option at will." <u>Id.</u> The <u>Lucas</u> court also noted that a similar argument had been addressed by the Eleventh Circuit. <u>Id.</u> In <u>Williams v. Barnhart</u>, 140 Fed. Appx. 932, 937 (11th Cir. 2005), the court wrote, "Although the ALJ failed to specify the frequency that Williams needed to change his sit/stand position, the reasonable implication of the ALJ's description was that the sit/stand option would be at Williams's own volition." The same is true in the present case.

The ALJ found that Plaintiff "requires the option to sit or stand as needed." [R. at 14]. A reasonable understanding of the ALJ's finding is that Plaintiff required a job that would allow him to perform the duties of the position by either sitting or standing based on his volition. The VE, in fact, testified that this was her understanding of the

20

ALJ's finding. The VE stated that a person requiring an option to sit or stand at will was still able to stay on task regardless of whether he was sitting or standing.[1] [R. at 63-65]. Furthermore, Plaintiff has failed to present evidence showing that "his need to sit or stand prevented him from performing the jobs identified by the VE, which he must do in order to be found disabled." Lucas, 2012 WL 6043089, at *4. For these reasons, the court concludes that the ALJ did not fail to apply the proper law when she included in the RFC assessment a requirement that Plaintiff be given the option to sit or stand "as needed."

Plaintiff argues that the ALJ also erred when she included in the RFC assessment a finding that Plaintiff "can frequently, but not repetitively, handle objects on the right." [R. at 14]. "Frequent" is defined by Social Security law as "occurring from one-third to two-thirds of the time." SSR 83-10. Plaintiff notes that "constantly" is defined by the Dictionary of Occupational Titles ("DOT") as occurring two-thirds or more of the time. [Doc. 13 at 14]. Although the ALJ used the term "repetitively,"

---

[1]Plaintiff's representative asked the VE about whether work was available for a hypothetical person who had to stand for ten minutes out of every hour and was not able to stay on task while standing. [R. at 65]. The VE stated that a person who had to be off task for this amount of time, essentially an hour and twenty minutes each day, would be precluded from work. [R. at 64-65]. But the VE's testimony in response to this hypothetical is not relevant because the ALJ did not find that Plaintiff would be off task while standing. [R. at 14, 55].

it is not defined in the DOT or Social Security regulations. Plaintiff argues that "[i]t would be difficult for an individual to frequently handle objects without doing so repetitively" and that the ALJ erred because she did not resolve this apparent conflict by defining the terms. [Doc. 13 at 14].

The court finds that there was no conflict in the ALJ's RFC assessment that needed to be resolved. As the Commissioner notes, it is clear from the ALJ's decision and her hypothetical at the administrative hearing that her use of the term "repetitive" has the same meaning as "constant." [Doc. 14 at 13]. At the hearing, the VE testified that all of the sedentary jobs that she identified as being consistent with the ALJ's RFC require at least frequent handling and fingering. [R. at 56-57]. The VE also stated that if a person was limited to occasional handling and fingering in both extremities, then none of the identified sedentary jobs would be available. [Id.]. The ALJ asked and the VE testified that the identified jobs could be performed by an individual who could use his dominant extremity "frequently, but not constantly." [R. at 57]. And as previously noted, the ALJ stated in her RFC that Plaintiff could handle objects with his right hand "frequently, but not repetitively." [R. at 14].

Although "repetitive" is not a term defined by the DOT, the context of the ALJ's decision and the administrative hearing make it apparent that the ALJ was using the

AO 72A

(Rev.8/82)

terms "constantly" and "repetitively" interchangeably.  Accordingly, there was no ambiguity that needed to be resolved by the ALJ.  The same issue has been addressed by other courts.  In <u>Summerall v. Astrue</u>, 2011 WL 1259705, at *13 (M.D. Fla. March 31, 2011), the court wrote, "the VE determined that 'repetitive' means 'constant' in the DOT and implicitly indicated that 'constant' requires use of the hands from two-thirds to 100 percent of an eight-hour workday."  The <u>Summerall</u> court found no error because, like the present case, the VE identified sedentary jobs "which do not require 'constant,' or 'repetitive,' use of the hands . . . ."  <u>Id.</u>, at *14; <u>accord</u> <u>Gallegos v. Barnhart</u>, 99 Fed. Appx. 222, 224-25 (10th Cir. 2004) (noting that "the VE expressly construed the term 'repetitive' to mean 'from two-thirds to 100 percent of the time'").  It is clear from the ALJ's decision and her statements at the administrative hearing that she found that Plaintiff could handle objects with his right extremity frequently, which is one-third to two-thirds of the time, but not constantly or repetitively, which is two-thirds or more of the time.  [R. at 14, 57].  Remand is not warranted on this issue.

Plaintiff's next argument is that the ALJ improperly rejected the findings of Dr. Saurabh Desai, a consultative physician.[2]  [Doc. 13 at 15-17].  Dr. Desai performed a

_____

[2]In this same section of Plaintiff's brief, he makes a short argument that he was unable to afford treatment and that this inability to pay for treatment justified his failure to comply with treatment.  [Doc. 13 at 15].  The Eleventh Circuit has held,

AO 72A

(Rev.8/82)

physical consultative examination of Plaintiff on May 29, 2009. [R. at 360-66].

Plaintiff reported that he experienced pain in his left arm, right leg, and back, numbness in both of his legs, and numbness and tingling in his left arm. [R. at 360-62]. Plaintiff informed Dr. Desai that he was unable to shower or put on his clothes unless his wife assisted him. [Id.]. Dr. Desai did not offer an opinion about Plaintiff's functional limitations. However, Dr. Desai found that Plaintiff had reduced strength and a reduced range of motion in his back, left arm, hips, and knees. [R. at 360-66]. Dr. Desai also observed that Plaintiff's gait was slow, he favored his right side, he used a cane, and he had difficulty walking without a cane. [R. at 365]. Plaintiff argues that the ALJ improperly relied upon her own interpretation of the medical evidence over that of Dr. Desai. [Doc. 13 at 15-17]. The court finds that the ALJ properly evaluated Dr. Desai's findings.

---

"[W]hen an ALJ relies on noncompliance as the *sole ground for the denial of disability benefits*, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment." Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (emphasis added). The ALJ did not discuss Plaintiff's alleged inability to pay for treatment. However, this was not error because the ALJ did not rely solely or even significantly on noncompliance in her decision denying benefits. See Dereyes v. Astrue, 2012 WL 4479581, at *12 (N.D. Ala. September 26, 2012) ("[W]here the ALJ does not base his decision significantly or solely on noncompliance, the ALJ does not err by failing to consider the claimant's inability to afford treatment.").

24

The ALJ wrote, "Dr. Desai's consultative examination noted a reduced range of motion and diminished strength and Dr. Desai essentially repeated the claimant's allegations with an observation of the claimant using a cane for difficult ambulation." [R. at 17]. The ALJ explained that in evaluating Dr. Desai's report, she was first required to determine "whether or not Dr. Desai's observations are consistent with the other medical evidence of record or did the claimant present much worse to agency personnel." [R. at 17]. The ALJ then offered a detailed discussion of Dr. Desai's findings, and she presented numerous reasons for finding that the physician's observations were not consistent with the other medical evidence in the record. [R. at 17-19]. The ALJ's actions in evaluating the consistency of Dr. Desai's report was in accordance with Social Security law. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). The relevant regulations provide:

> We consider evidence to be inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques. . . . If any of the evidence in your case record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have.

20 C.F.R. §§ 404.1520b, 416.920b.

25

The ALJ noted that on November 17, 2008, Plaintiff "was trimming a tree at his mother-in-law's home when he fell from the top of a ladder." [R. at 16]. As the ALJ explained, as of this date, Plaintiff "was able to climb a tree and trim branches with a saw. . . ." [R. at 17]. An exhaustive evaluation of Plaintiff was performed immediately after this accident. [R. at 17-18, 270]. The ALJ wrote, "While a computerized tomography scan of the cervical spine revealed degenerative disc disease, his neck exhibited a full range of motion and the scan did not reveal significant central canal stenosis." [Id.]. No tenderness or deformities were noted in Plaintiff's back upon examination, and he denied any neck or back pain. [R. at 18, 270]. Follow-up examinations in late November and late December 2008 showed that Plaintiff's only complaint was about his right wrist. [R. at 18, 284, 286]. These relatively mild treatment notes, which were recorded immediately after Plaintiff fell approximately 30 feet from a ladder, are not consistent with Plaintiff's reports to Dr. Desai, made five months later, of leg and back pain and of difficulty walking without a cane. [R. at 360-66].

The most significant evidence that conflicts with Dr. Desai's observations were treatment notes from exams occurring on May 21 and May 26, 2009. [R. at 18, 293, 295]. Plaintiff was seen for cellulitis and chest pain. [Id.]. The ALJ noted that

Plaintiff "was noted to have a full range of motion in all extremities without abnormality" and "there was no tenderness to palpation in his lower extremities." [R. at 18, 293, 295]. Yet, as the ALJ pointed out, both of these exams occurred only a few days before Plaintiff's consultative examination with Dr. Desai, which took place on May 29, 2009. [R. at 18, 360-66]. Although Plaintiff had full range of motion on May 21, 2009, eight days later Dr. Desai found reduced range of motion in Plaintiff's back, left arm, hips, and knees. [R. at 293, 360-66]. On May 21 and 26, 2009, no back or leg pain was noted, and there was no observation of Plaintiff using a cane and no notation about him needing to walk with a cane. [R. at 293, 295]. But on May 29, 2009, Plaintiff reported to Dr. Desai that he experienced pain in his right leg and back and numbness in both of his legs. [R. at 360-62]. Dr. Desai also noted that Plaintiff's gait was slow, he favored his right side, he used a cane, and had difficulty walking without a cane. [R. at 365].

The ALJ noted in detail the inconsistencies between Dr. Desai's consultative exam and the rest of the medical record. [R. at 18]. The ALJ explained:

> With no radiographic evidence of a severe or even moderate unhealed abnormality and with treating physicians noting a full range of motion and no one commenting upon the use of a cane due to walking difficulty, the presentation of the claimant at the consultative examination and thereafter does not appear corroborated. Indeed, after a patient has fallen

27

from a tree, difficulties with gait would be noted and consideration of further x-rays of the back, hip, and legs would appear indicated. The absence of these observations and the notation of otherwise normal systems suggests that the claimant's exhibition of using a cane was for the benefit of the consultative examiners and not because the claimant had limitations in this area.

[R. at 18]. Although the ALJ found that "Dr. Desai appeared to rely quite heavily on the claimant's statements as to his limitations," the ALJ nevertheless included in the RFC a number of the limitations that Plaintiff reported to Dr. Desai. The ALJ's RFC assessment restricted Plaintiff to sedentary work with an option to sit and stand as needed and included many postural and functional limitations. [R. at 14, 19]. The ALJ also stated in the RFC and hypothetical to the VE that Plaintiff "uses an assistive device for ambulating." [R. at 14, 55]. Even with all of these limitations, the VE testified that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [R. at 22, 56].

The Eleventh Circuit has held, "The [Commissioner], and not the court, is charged with the duty to weigh the evidence, to resolve material conflicts in the testimony, and to determine the case accordingly." Wheeler, 784 F.2d at 1075; accord Watson v. Heckler, 738 F.2d 1169, 1172 (11th Cir. 1984) ("Although Dr. Gray made a contrary residual functional capacity evaluation it was the responsibility of the

administrative law judge to resolve the conflict."). In the present case, although Dr. Desai did not offer an opinion about Plaintiff's functional limitations, he did offer findings and observations about Plaintiff's physical condition. The ALJ, in evaluating Dr. Desai's report, did not play the role of medical expert and rely on her own medical opinion. Rather, as she was required to do, the ALJ weighed Dr. Desai's findings and observations and found that they were not consistent with the other medical evidence in the record. The ALJ noted in particular the significant differences between Dr. Desai's observations of Plaintiff and the observations made by treating physicians just a few days prior. The ALJ applied the proper law when she evaluated Dr. Desai's opinion, and substantial evidence supports her decision on this issue. See Green v. Social Security Admin., 223 Fed. Appx. 915, 924 (11th Cir. 2007) ("The ALJ did not substitute his judgment for that of Dr. Bryant; rather, he determined that Dr. Bryant's opinion was inconsistent with objective medical evidence in the record.").

**B.    ALJ's Credibility Determination**

The ALJ wrote in her decision that she found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are

29

inconsistent" with the ALJ's assessment of Plaintiff's RFC. [R. at 15]. Plaintiff argues that the ALJ did not apply the appropriate legal standards in assessing his credibility and that her credibility determination is not supported by substantial evidence. [Doc. 13 at 17]. The undersigned finds that the ALJ did not commit error when she evaluated Plaintiff's allegations and found that they were not entirely credible.

The relevant Social Security regulations provide that factors which will be considered by the ALJ in evaluating a claimant's subjective symptoms include: daily activities; location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate his symptoms; treatment received and measures used, other than medication, for the relief of symptoms; and any other factors concerning the functional limitations and restrictions due to the claimant's symptoms. See 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. Where a claimant's testimony, if credited, could support the claimant's disability, the ALJ must make and explain a finding concerning the credibility of the claimant's testimony. See Viehman v. Schweiker, 679 F.2d 223, 227-28 (11th Cir. 1982). "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." Wilson, 284 F.3d at 1225 (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).

The ALJ described Plaintiff's testimony in detail. The ALJ noted that Plaintiff testified that he began experiencing pain at age thirteen when he was in a motorcycle accident and injured his arm which required multiple surgeries. [R. at 15, 43-44]. On November 17, 2008, Plaintiff fell approximately 30 feet from a ladder while trimming a tree. Plaintiff testified that as a result of the fall, he experiences daily swelling of the knee, pain in his hip, and numbness in his right leg. [R. at 15, 42-46, 51]. Plaintiff stated that he is only able to sit for fifteen to twenty minutes before he has to stand up to relieve the pain and that he can stand for only ten to fifteen minutes at one time with a cane or walker. [R. at 15, 35]. He performs no household chores and spends most of his time in bed. He has to sit to shave and shower. [R. at 15, 35-36, 47-49]. Plaintiff testified that if he alternated between sitting and standing, he could proceed for three hours but that then he would need to lie down to relieve his back pain. [R. at 15, 53]. Plaintiff claims that he is unable to bend and that he uses a cane for walking as well as a walker for longer distances. [R. at 15, 35-36, 53].

The ALJ found that Plaintiff's testimony about the intensity, persistence, and limiting effects of his symptoms are not entirely credible. For the reasons discussed *infra*, the court concludes that the ALJ fulfilled her duty to provide explicit and adequate reasons for making her credibility determination. The ALJ noted that

although Plaintiff alleged that he began experiencing pain when he was injured in a motorcycle accident at age thirteen, "the motorcycle injuries sufficiently healed to allow the claimant to climb and cut trees." [R. at 18]. After Plaintiff's fall from a ladder in November 2008, he had a fractured wrist and rib, but these injuries healed well. [R. at 18]. There is no evidence that the fall affected his back or legs. Treatment notes from examinations which were performed immediately after Plaintiff's fall show that he had a full range of motion in his neck, and he denied any neck or back pain. [R. at 17-18, 270]. Given this evidence, it is not surprising that the ALJ concluded that "there appears no reason for the claimant to walk slowly with a cane and stay in bed nearly the entire day." [R. at 18].

The ALJ also noted that treatment notes revealed that Plaintiff exaggerated his fall. [R. at 18, 270]. The claimant reported to the treating source that he fell from 40 feet, and he testified before the ALJ that he fell 30 feet. However, as the ALJ explained, "In the emergency department, his family corrected his report, indicating the ladder was only twenty feet up and the claimant had slid halfway down the ladder before he started his unrestrained fall that resulted in the forearm fracture." [R. at 18, 270]. In addition, as discussed *supra*, the ALJ noted that even after the fall, there was a lack of objective evidence of back or leg problems and that there were no comments

32

from treating sources regarding Plaintiff's use of a cane or difficulties with gait. [R. at 18].

The ALJ found that Plaintiff's testimony also lacked credibility due to his statements about the use of medication. Plaintiff testified that he only used over-the-counter pain medication because he did not want to become addicted to stronger medication. However, he also admitted that prescription medication relieved his pain sufficiently for him to work. [R. at 18, 38-41]. The ALJ noted, "There is nothing in the record of the claimant being addicted to narcotic strength pain medication or any substance other than tobacco. There is no evidence that he spoke to his physician regarding his concerns so that his dosage or the type of medication could be changed." [R. at 18]. Given Plaintiff's testimony that prescription pain medication helped him and allowed him to do his job, the court finds that the ALJ properly questioned Plaintiff's credibility after he made a unilateral decision to stop taking prescription medication.

Plaintiff makes a brief argument that the ALJ did not properly evaluate his credibility with respect to his allegations of mental limitations. [Doc. 13 at 18]. During a psychological examination with Dr. Rebecca Blakeman in July 2009, Plaintiff stated that he is "irritated, frustrated, and quick tempered." [R. at 313]. Plaintiff also

reported to Dr. Blakeman that he tends to isolate himself and that he has difficulty with memory and concentration. [R. at 313]. The ALJ did not credit Plaintiff's allegations of mental limitations to the extent they are inconsistent with the ALJ's RFC assessment. [R. at 15, 19]. The ALJ wrote:

> In terms of the claimant's alleged difficulty concentrating and dealing with others due to mental impairments and pain, the claimant's reasonably demonstrated restrictions are fully accounted for by the limitation to simple work, with occasional interaction with other employees, supervisors and the public. Further limitations are not required in the residual functional capacity because the medical evidence of record and the activities of the claimant show that he is not as limited as alleged.

[R. at 19]. The court finds that the ALJ adequately explained her reasons for finding that Plaintiff's allegations of mental limitations were not entirely credible.

The ALJ first noted the lack of mental health treatment. As the ALJ pointed out, there is no evidence in the record that Plaintiff was ever treated for mental problems or that he was prescribed any medication for mental health. [R. at 20]. The ALJ also wrote, "Other than one remark that the claimant was anxious while undergoing a medical crisis, the only notations in the record concerning mental health are that the claimant was alert and fully oriented." [Id.]. The only full evaluation of Plaintiff's mental health occurred when Dr. Blakeman performed a psychological consultative

34

examination in July 2009. [R. at 19-21, 312-316]. Dr. Blakeman diagnosed Plaintiff with anxiety disorder and major depressive disorder, mild to moderate. [R. at 20, 315]. As the ALJ explained, Dr. Blakeman found that Plaintiff was capable of acquiring and using new information and could understand and follow verbal directions. [R. at 20, 316]. Despite Plaintiff's allegations of difficulty with memory and concentration, Dr. Blakeman concluded that Plaintiff's memory and concentration were expected to be adequate in the work setting. [Id.].

Dr. Blakeman found that Plaintiff's persistence may be low due to depression, which could hinder his ability to meet production norms. [R. at 20, 316]. However, Dr. Blakeman also concluded that "if [Plaintiff] were physically able to perform job tasks, he would likely experience a decrease in mood difficulties." [R. at 316]. The ALJ noted this finding and explained, "Dr. Blakeman relates most of the depression to the claimant not working. Presumably, the depression would not be an impediment to work as it would evaporate when the claimant returned to work." [R. at 21]. The ALJ's explanation is consistent with her finding that Plaintiff was physically capable of performing work at the sedentary level. The ALJ also wrote that Dr. Blakeman's minimal findings of average concentration and mild to moderate depression and anxiety were taken into account in the ALJ's RFC which limited Plaintiff to simple

35

work, avoidance of hazards, and limited interaction with others. [R. at 20-21]. The court finds that the ALJ adequately explained her findings regarding Plaintiff's mental limitations and that substantial evidence supports the ALJ's decision not to credit Plaintiff's allegations of mental limitations to the extent that they are inconsistent with the RFC assessment.

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam). The ALJ in the present case articulated numerous explicit reasons for finding that Plaintiff's testimony was not entirely credible. The ALJ adequately evaluated Plaintiff's credibility and this evaluation was supported by substantial evidence. Remand is not warranted on this issue.

### C.    Testimony of the Vocational Expert

Plaintiff's final argument is that the VE's testimony cannot provide substantial evidence for the ALJ's decision to deny benefits. [Doc. 13 at 19-20]. According to Plaintiff, the hypothetical question that the ALJ posed to the VE was inadequate and incomplete. [Doc. 13 at 19]. Social Security law requires the ALJ to accurately and comprehensively describe the claimant's impairments when posing a hypothetical to a VE. See Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).

AO 72A
(Rev.8/82)

In the present case, Plaintiff acknowledges that the ALJ's hypothetical question "contained the same limitations set forth in the RFC." [Doc. 13 at 19]. The VE responded to the hypothetical by stating that there are jobs that exist in significant number in the national economy that Plaintiff can perform. [R. at 55-56]. Plaintiff's argument regarding the VE's testimony is based on the same arguments discussed *supra* with respect to the ALJ's RFC assessment. Plaintiff contends that "the ALJ's RFC and hypothetical questions vary as to the terms used to describe Emory's ability to handle; the sit/stand opinion was not meaningfully defined; and all of Emory's mental limitations were not accounted for." [Doc. 13 at 19]. For the reasons previously discussed, the court has concluded that the ALJ's RFC assessment was supported by substantial evidence and was the result of an application of proper legal standards. Because the ALJ included all of the RFC limitations in her hypothetical to the VE, the testimony of the VE amounts to substantial evidence supporting the ALJ's finding that Plaintiff was not disabled.

## VI. Conclusion

For all the forgoing reasons and cited authority, the undersigned finds that the ALJ applied proper legal standards in reaching her decision that Plaintiff was not disabled, and that the ALJ's decision was supported by substantial evidence. It is,

37

therefore, **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**. See Melkonyan v. Sullivan, 111 S. Ct. 2157 (1991).

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule 72.1, and Standing Order 08-01 (N.D. Ga. June 12, 2008). The Clerk, therefore, is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED**, this 5th day of February, 2013.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A

(Rev.8/82)